## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |
|---|---|
| BAYMONT FRANCHISE SYSTEMS, INC., | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| THE BERNSTEIN COMPANY, LLC and DAVID B. BERNSTEIN, | : |
|  | : |
| Defendants. | : |

**Civil Action No. 18-620-JMV-AME**

**OPINION & ORDER**

---

**ESPINOSA**, Magistrate Judge

This matter comes before the Court on the motion by Defendants David B. Bernstein ("Bernstein") and The Bernstein Company ("TBC") (collectively, "Defendants") for leave to file a Fifth Amended Answer, Counterclaim and Third Party Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). [D.E. 83] Plaintiff Baymont Franchise Systems, Inc. ("BFS") and prospective Third Party Defendant Wyndham Hotel Group, LLC ("WHG") oppose the motion. For the reasons that follow, the motion is denied.[1]

---

[1] Although the motion has nominally been filed by both Defendants, BFS and WHG note in their opposition brief that TBC is technically in default. Indeed, on July 9, 2018, the Clerk entered default against TBC pursuant to Federal Rule of Civil Procedure 55, for failure to enter an appearance and file an answer through counsel. Since that time, Bernstein, previously pro se, and TBC retained an attorney, who now appears on their behalf. To date, however, TBC has not sought to vacate default. Nevertheless, because the parties address the merits of the motion as if default were vacated, and because this District applies Rule 55's good cause standard for vacating default with a preference for adjudication on the merits, the Court assesses here whether Bernstein and TBC collectively may file an amended pleading.

I. **BACKGROUND**

A.    **Facts Alleged in the Complaint**

This breach of contract action arises out of franchisee TBC's alleged violation of a hotel franchise agreement, resulting in the premature termination of the franchise by franchisor BFS. BFS owns the rights to the "Baymont System" for providing guest lodging services, i.e., a hotel franchise. It contracts with franchisees giving them the right to operate hotels bearing the Baymont name and to participate in the Baymont franchise system in exchange for various payments.

On or about September 29, 2014, BFS and TBC entered into an agreement under which TBC would operate a 60-room hotel in Rome, Georgia, for a 20-year term, running from the opening date (the "Franchise Agreement").[2] On the same date, Bernstein, TBC's principal, executed a Guaranty, in which Bernstein agreed, among other things, that he was personally responsible for fulfilling TBC's obligations under the Franchise Agreement in the event of default. At the time the Franchise Agreement and Guaranty were executed, TBC was still operating its hotel as a different franchise pursuant to a contract with another franchisor. The TBC hotel ultimately opened as a Baymont facility pursuant to the Franchise Agreement on or about April 14, 2016, doing business under the name Baymont Inn & Suites of East Rome.

The Franchise Agreement required TBC, among other things, to pay BFS various fees throughout the contractual term, including payments for royalties, marketing, reservation system access, and others. It also required TBC to submit monthly reports to BFS disclosing gross room

---

[2] The agreement is attached to the Complaint as Exhibit A and, for simplicity, is referred to herein as the "Franchise Agreement."

revenue, for the purpose of calculating royalties and other recurring fees due. TBC would, in exchange, benefit from using the Baymont mark and from various support services provided by BFS, including training programs, marketing activities, and a reservation system operated and maintained by BFS.

The Franchise Agreement also gave BFS certain rights and remedies in the event of TBC did not pay fees owed, failed to perform its obligations, or otherwise breached the Franchise Agreement, any of which would be considered a default. It provided that, upon notice to TBC of default, BFS would extend a period to cure the default, after which BFS could exercise its right to terminate the Franchise Agreement. BFS also had the unilateral right of termination under the Franchise Agreement, on notice to TBC, should TBC discontinue operating the hotel as a Baymont facility and/or lose possession or the right to possession of the subject facility. The Franchise Agreement further provided that, in the event of termination due to TBC's actions, TBC would be required to pay liquidated damages, calculated according to the formula provided therein.

According to the Complaint, on or about July 5, 2017, TBC sold its Baymont facility to a third party without BFS's consent. BFS deemed this action to trigger the Franchise Agreement's termination provision and advised TBC, by letter of August 4, 2017, that the sale caused the "automatic termination of the Franchise Agreement." (Complaint, Ex. C.) The August 4, 2017 letter further informed TBC it was required to comply with its post-termination obligations, including payment of liquidated damages and all outstanding fees. BFS provided documentation of the amounts owed and demanded payment within ten days.

**B. Procedural History**

BFS filed this lawsuit on January 1, 2018, to recover liquidated damages, or alternatively actual damages, and outstanding fees pursuant to the Franchise Agreement and the Guaranty. Bernstein entered an appearance pro se and also attempted to proceed on behalf of TBC, as the company's principal. [3] Bernstein thereafter moved to dismiss the Complaint. By Order of April 1, 2019, the Court denied his motion and instructed him to answer. On April 29, 2019, Bernstein filed an Answer and Counterclaim, in which he alleged BFS had also breached its contractual obligations by failing to provide an adequate reservation system and other franchisee support, overcharging recurring fees, and permitting another Baymont franchise to open in Rome, Georgia. Bernstein thereafter sought to amend the Answer and Counterclaim various times, as detailed more fully in the Opinion and Order of June 17, 2020 (the "June 2020 Order"). (See D.E. 56.) The June 2020 Order granted Defendants leave to file a Fourth Amended Answer, Affirmative Defenses, Counterclaim and Third Party Complaint (the "Fourth Amended Counterclaim") but warned that Bernstein's repetitive failure to cure deficiencies may warrant denial of any future motion for leave to further amend. After the Fourth Amended Counterclaim was filed, BFS and WHG promptly moved to dismiss.

At or around that time, Bernstein and TBC retained counsel to represent them in this action. Through their attorney, Defendants responded to the motion to dismiss the Fourth Amended Counterclaim by withdrawing the pleading and instead asking the Court to grant leave

---

[3] Although Bernstein appeared pro se, the record reflects that, at some point in his career, he had been a practicing attorney licensed in the State of Louisiana. However, he is not admitted to the bar of this District, and the Court accordingly denied his request to appear on behalf of TBC, a limited liability company. (See D.E. 14.)

to file a further amended answer. In light of this filing and of Defendants' failure to comply with the District's Local Civil Rules governing motion practice, the Honorable John M. Vazquez entered an order on February 22, 2021, striking the Fourth Amended Counterclaim without prejudice and providing Defendants an opportunity to file a motion for leave to amend in compliance with Local Civil Rule 15.1. (See D.E. 81.)

On March 24, 2021, Defendants filed this motion for leave to file a Fifth Amended Answer, Counterclaim and Third Party Complaint pursuant to the Court's February 22, 2021 Order.

## II.    DISCUSSION

The motion presently before the Court seeks leave to file a pleading asserting five counterclaims against BFS: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) violation of the federal franchise rule; (4) violation of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et seq.*; and (5) violation of the New Jersey Consumer Fraud Act, N.J.S.A 56:8-1, *et seq.* (Hereinafter, the Court will refer to the proposed pleading simply as the "Counterclaim" insofar as it concerns claims asserted against BFS.) The proposed pleading also includes a Third Party Complaint against WHG asserting the same five claims. The claims, which will be discussed in more detail below, generally arise out of the following alleged misconduct by BFS and/or WHG: failure to honor assurances made concerning the Franchise Agreement; failure to provide franchisor support services, including adequate reservation system access and functionality; and retaliatory interference with reservations to the Baymont facility operated by TBC.

BFS and WHG argue primarily that leave to amend should be denied as futile. They also oppose the motion on the basis that the proposed amendment would unduly delay this litigation, cause them prejudice, and constitute a repetitive and improper attempt to cure deficiencies in claims previously rejected by the Court.

### A.      Legal Standard

Federal Rule of Civil Procedure 15(a)(2) provides "[t]he court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, it is well-established that leave to amend may be denied for various equitable reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and/or] futility of amendment . . .." Foman v. Davis, 371 U.S. 178, 182 (1962). The decision to grant or deny leave to amend rests within the discretion of the court. Id.

In considering the equitable reasons for denying a motion for leave to amend under Rule 15, the Court must be guided by the Third Circuit's consistent recognition "that prejudice to the non-moving party is the 'touchstone for the denial of an amendment.'" Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006) (quoting Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)). Undue delay, as a basis for denying a motion for leave to amend, focuses on whether the party seeking leave has inexplicably failed to take advantage of previous opportunities to amend, resulting in unfair burdens to the court and the opposing party. Id. While undue delay concerns the moving party's reasons for not amending earlier in the action, undue prejudice focuses on the potential effect of the proposed amendment on the opposing party. Adams v. Gould Inc., 739

F.2d 858, 868 (3d Cir. 1984). The Third Circuit has held that an amendment may be unduly prejudicial if it "would result in additional discovery, cost, and preparation to defend against new facts or new theories." Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001). Futility, in the context of assessing the merits of a motion for leave to amend under Rule 15, "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997); see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (holding same). Accordingly, "[i]n assessing futility, the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." Burlington, 114 F.3d at 1434; see also Massarsky v. General Motors Corp., 706 F.2d 111, 125 (3d Cir.), cert. denied, 464 U.S. 937 (1983) (holding that a motion for leave to amend may be denied on grounds of futility when the amendment would not withstand a Rule 12(b)(6) motion to dismiss).

### B.      Counterclaim Against BFS

Opposition to the motion for leave to file the Counterclaim rests primarily on grounds of futility. BFS argues that Defendants do not plead a legally sufficient claim for breach of contract, or breach of the covenant of good faith and fair dealing, as the Counterclaim fails to identify which contractual provision has allegedly been violated and does not otherwise address the express terms of the Franchise Agreement. BFS further argues that Defendants' other proposed claims, arising under federal and statutory law, are simply not viable under the applicable statutes and should therefore not be added, despite the liberal amendment standard of Rule 15. Defendants, in reply, do not address the substance of these arguments and instead merely assert,

tautologically, that the claims are "predicated on grounds for which relief can be granted and so 12(b)(6) in applicable." (Pl. Reply at 3.)

The Court, however, must apply precisely the Rule 12(b)(6) standard in assessing the viability of potential claims to determine whether Defendants' motion for leave to amend is futile. Burlington, 114 F.3d at 1134. Under the Rule 12(b)(6) standard of legal sufficiency, the question before a district court is whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The United States Supreme Court instructs that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint's "threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under the federal pleading standards. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). In examining the sufficiency of a pleading, a court may consider only the proposed pleading, exhibits attached to that pleading, matters of public record, and undisputedly authentic documents provided the claims are based on those documents. Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993); see also West Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 97 n.6 (3d Cir. 2010) (noting that while matters extraneous to the pleadings may generally not be considered in examining the sufficiency of the claims under Rule 8, a "limited exception exists for documents that are 'integral or explicitly relied upon in the complaint.'").

Applying the foregoing principles, the Court will review in turn each of Defendants' five proposed counterclaims against BFS.

    1.   <u>Breach of Contract</u>

To state a claim for breach of contract under New Jersey law, a complaint must allege the following elements: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." [4] <u>Frederico v. Home Depot</u>, 507 F.3d 188, 203 (3d Cir. 2007); <u>see also</u> <u>Globe Motor Co. v. Igdalev</u>, 225 N.J. 469, 482 (2016) (listing the four essential elements of a breach of contract claim). Clearly, Defendants' proposed Counterclaim sufficiently pleads the first element of the breach of contract claim; indeed, this entire action is predicated on the business relationship established by the Franchise Agreement. The factual allegations establishing the undisputed existence of a Franchise Agreement between BFS and TBC and of the related Guaranty executed by Bernstein suffice to give each of the Defendants the right to assert a breach of contract claim against BFS. <u>See</u> <u>Travelodge Hotels, Inc. v. Elkins Motel</u> <u>Assoc., Inc.</u>, No. 03–799(WHW), 2005 WL 2656676, at *14 (D.N.J. Oct.18, 2005) (holding that while a guarantor generally "cannot rely on an independent cause of action existing in favor of the principal against the creditor as a defense or counterclaim," an exception to this rule applies

---

[4] New Jersey law applies pursuant to the Franchise Agreement's choice of law provision, which states the "Agreement will be governed by and construed under the law of the State of New Jersey, except for its conflicts of laws principles." (Franchise Agreement ¶ 17.6.1.) Moreover, "[u]nder the familiar doctrine of *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, (1938), federal courts sitting in diversity jurisdiction apply state law to substantive issues and federal law to procedural issues." <u>Collins v. Mary Kay, Inc.</u>, 874 F.3d 176, 181 (3d Cir. 2017). The parties have not raised any conflict of laws issues, with regard to the breach of contract claim or any other claim presented in the proposed Counterclaim and Third Party Complaint.

when both "principal and guarantor are joined as Defendants.") (citing <u>Continental Group, Inc. v.</u> <u>Justice</u>, 536 F. Supp. 658, 661 (D.Del.1982)).

The futility of adding Defendants' breach of contract claim, BFS argues, concerns the second element. BFS contends the proposed claim does state the Franchise Agreement has been breached by BFS because, while the Counterclaim recites a variety of purported acts of malfeasance by BFS, it does not connect any of these alleged instances of misconduct with an applicable provision of the Franchise Agreement.

The Court notes that neither party has provided much guidance in applying the Franchise Agreement to the factual allegations set forth in the proposed pleading. The Court has itself undertaken the task of parsing the Counterclaim's factual allegations and examining whether they may state a claim when reviewed against the governing Franchise Agreement. In doing so, it has categorized the Counterclaim's litany of alleged misconduct by BFS into the following groupings:

First, Defendants allege BFS contravened the parties' agreement that TBC would operate the sole Baymont hotel in Rome, Georgia. Bernstein alleges that, during negotiations with BFS's agent, Frazier, "Bernstein emphasized that TBC's business plan was predicated upon being the sole Baymont Inn & Suites in Rome, Georgia. Bernstein asked BFS's agent, Craig Frazier, about BFS's spacing and marketing strategy and Mr. Frazier assured Bernstein that BFS was very professional and thorough in its market research and is careful not to pack a small market such as Rome with more than one Baymont Inn." (Counterclaim ¶ 7.) Defendants claim they entered into the Franchise Agreement based on Frazier's assurance that the franchise rights to operate a Baymont facility in Rome, Georgia, were to be exclusively held by TBC. However, according to

10

the Counterclaim, BFS did enter into another agreement with a competing franchisee while TBC was still operating as a Hampton Inn pursuant to another franchise contract. TBC claims that in further violation of the Franchise Agreement, BFS permitted the competitor to operate under the name "Baymont Inn & Suites of Rome," leaving the less desirable Baymont of "East Rome" moniker to TBC's facility. The proposed Counterclaim avers that these alleged breached resulted in reduced sales, diminished the value of Defendants' property, and even led to the cancellation of an impending sale of the property to a third party in or about June 2015.

Second, Defendants aver BFS charged TBC excessive fees. This aspect of the claim is also based on pre-agreement negotiations. The Counterclaim avers that Frazier offered Defendants the rate of "6% [of sales] for combined royalty and marketing fees for the first three years [of the contractual term], 8.5% thereafter, which was therefore "the rate Bernstein assumed he would be charged." (Counterclaim ¶ 9.) However, according to the proposed pleading, BFS reneged on this promise and charged fees "well in excess of 6%." (Id.)

Third, Defendants claim "BFS failed to provide Defendants with a variety of franchisor support services, including, but not limited to: (1) access to Wyndham's reservation and property management systems, (3) training, and (4) marketing, group sales, and transient sales support . . .." (Counterclaim ¶ 24) (preserving numbered list in original). In support of this claim for breach of contract, the Counterclaim alleges BFS delayed access to the franchise-wide reservation system for four to five weeks after TBC's facility opened. It further alleges BFS "did not have its reservation system fully integrated with third party internet providers for approximately three months." (Id. ¶ 14.)

Fourth, Defendants claim BFS wrongfully suspended and/or interfered with TBC's ability to utilize the franchise reservation system. According to the Counterclaim, TBC fell behind on its payment of royalties and other required fees in or about June 2016, and although it made a substantial payment toward its arrears in or about October 2016, BFS, "without warning" allegedly "cut off its reservation system to TBC." (Id. ¶ 17.) Additionally, Defendants aver BFS employed a false, misleading, and "aggressive collection tactic" by causing the reservation system to indicate the TBC facility was unavailable for reservations, beginning on December 19, 2016, and continuing through July 5, 2017, the date the Franchise Agreement was terminated. (Id. ¶ 18.)

Despite these factual allegations, Defendants fail to set forth the necessary link between BFS's alleged misconduct and any obligation in the Franchise Agreement. As a result, even assuming the facts alleged are true, Defendants' proposed Counterclaim does not plausibly state BFS is liable for breach of contract, a deficiency that renders the proposed claim futile. The first two categories of alleged breaches, as discussed above, are not based on the Franchise Agreement itself. Rather, they concern Defendants' frustrated expectations about the business venture. The Counterclaim fails to demonstrate where in the Franchise Agreement TBC was

guaranteed exclusive rights to a Baymont franchise in Rome, Georgia, and/or the lower fees Defendants claim BFS promised in negotiations.[5]

The Court's own review of the Franchise Agreement reveals that the Franchise Agreement contradicts Defendants' proposed claim as to the alleged failure to provide Defendants an exclusive territory and/or the recurring fees allegedly discussed in negotiations.[6] Specifically, the Franchise Agreement does not provide TBC exclusive rights to operate a Baymont hotel in Rome, Georgia. It provides in relevant part:

> Protected Territory. [BFS] will not own, operate, lease, manage, franchise or license anyone but you to operate a Chain Facility in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.

---

[5] Reading the Counterclaim liberally, the Court observes these allegations appear to invoke a fraud in the inducement theory of liability, in which TBC might claim that it entered into the Franchise Agreement based on allegedly false assurances by BFS. Cf. Travelodge Hotels, Inc. v. Honeysuckle Enters, Inc., 357 F. Supp. 2d 788, 795-96 (D.N.J. 2005) (permitting parol evidence of communications between the parties prior to executing a franchise agreement and denying the motion for summary judgment, reasoning that the evidence pertained to the plaintiff's counterclaim for fraud in the inducement). However, that claim is not before the Court on this motion.

[6] The Franchise Agreement, attached as Exhibit A to the Complaint filed by BFS, is part of the record. Though not separately attached to the proposed Counterclaim, the Franchise Agreement forms the basis of the breach of contract claim and may therefore be properly considered by the Court in assessing the viability of that claim. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (holding that a court reviewing the sufficiency of a complaint may consider information integral to the complaint); Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998) (holding that, in assessing the viability of a claim on a Rule 12(b)(6) motion, courts may consider allegations in the complaint, documents attached thereto or specifically referenced therein, and matters of public record).

(Franchise Agreement ¶ 2.) The "Protected Territory" is defined as an area consisting of a four-mile radius, measured from the franchisee facility. (Franchise Agreement, App'x A.) The Counterclaim does not allege the competing Baymont franchise was located within the protected territory, but, even if it had, the Franchise Agreement expressly permits BFS to grant other franchisees the right to operate within an overlapping territory. To the extent the Counterclaim bases the breach claim on BFS's permitting another Baymont hotel in Rome, Georgia, to use the more desirable name Defendants expected to use, it also lacks a contractual basis. Regarding facility naming, the Franchise Agreement merely provides:

> You will call the Facility a BAYMONT Inn & Suites. You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

(Franchise Agreement ¶ 1.) Similarly, the allegation that BFS agreed to charge TBC 6% of gross room revenues in combined royalty and marketing fees and breached the Franchise Agreement by requiring payment in excess of this amount is directly contradicted by the Franchise Agreement, which expressly sets forth the applicable fees in Section 7 and Schedule C.

The Court turns, then, to the third category of alleged misconduct on which the proposed breach of contract claim is based, that is, BFS's alleged failure to provide franchise support services to Defendants. Here, too, leave to amend must be denied. Insofar as the claim for breach of contract concerns training and marketing allegedly not provided by BFS, the amendment would be futile. The proposed Counterclaim makes a conclusory assertion that Defendants were deprived of these services, unsupported by any factual allegations. BFS's allegedly delayed integration of TBC into the reservations system may, arguably, plead a sufficient breach of contract claim, though Defendants fail to indicate which specific provision of the Franchise

Agreement was violated.[7] However, even assuming the claim could, in this regard, withstand a Rule 12(b)(6) motion to dismiss, the Court finds that leave to amend is nevertheless unwarranted on grounds of undue delay. This case was filed over three years ago. Defendants have had numerous opportunities to assert such a breach of contract claim, yet they fail to persuasively explain why the claim was not brought sooner. Defendants point out they previously lacked legal representation and state they gained a better understanding of their legal remedies only after securing counsel. However, the Court notes that Defendant Bernstein not only has a legal background but has actively litigated this case and repeatedly filed amended counterclaims.

Finally, as to BFS's allegedly wrongful suspension of reservations, the Counterclaim's assertion that this action violated the Franchise Agreement is belied by contract itself. The Franchise Agreement makes clear that BFS is not obligated to provide computerized reservations services if the franchisee is not current on fees. It states that BFS uses "Basic Reservation Fees" to provide the reservation system to the franchisee and expressly provides: "We or our approved supplier will provide software maintenance and support for the software we or an approved supplier license to you to connect to the Reservation System *if you are up to date in your payment of Recurring Fees and all other fees you must pay* under any other agreement with us, an affiliate or the supplier, as applicable." (Franchise Agreement ¶ 4.2, emphasis added.) It further provides that BFS may suspend TBC's access to the reservation system and in fact may

---

[7] Rather than citing the Franchise Agreement, the Counterclaim alleges BFS's delay in providing reservation services violated a contract it refers to as the "WynGuest Agreement" insofar as the agreement promised to "use commercially reasonable efforts to make the Services available for 24 hours a day, 7 days a week" with certain exceptions. (Counterclaim ¶ 13.) However, the Counterclaim provides no information concerning the parties to the WynGuest Agreement nor any context for the provision BFS cites.

also discontinue and divert reservations activity, in the event of default or failure to pay or perform as required by the Franchise Agreement. (Franchise Agreement ¶ 11.4)

In sum, for the foregoing reasons, the Court concludes, in its discretion, that leave to amend the Counterclaim under Rule 15(a)(2) to permit Defendants to assert a breach of contract claim against BFS must be denied.

### 2. Claim for Breach of the Covenant of Good Faith and Fair Dealing

Defendants also seek to pursue a counterclaim against BFS for breach of the covenant of good faith and fair dealing. Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract's terms. Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). The covenant has the effect of an implied commitment that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 421 (1997). A party to a contract may, in some instances, not have breached the contract's express terms and yet may nevertheless be liable under the covenant for engaging in conduct that frustrates the other party's receipt of the bargained-for benefit. Brunswick Hills Racquet Club Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005). The theory has its limits, however. The New Supreme Court has held that the implied covenant of good faith and fair dealing cannot, however, override a contract's express terms. Wilson, 168 N.J. at 244. Additionally, a claim for breach of the implied covenant of good faith and fair dealing requires a concrete factual allegation of bad faith or ill motive. Travelodge Hotels, Inc. v. Elkins Motel Assocs., Inc., 2005 WL 2656676, at *5 (citing Seidenberg v. Summit Bank, 348 N.J. Super. 243, 257 (App. Div.2002)). Warning against overly broad constructions of the

covenant of good faith, the New Jersey Supreme Court held that "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive." Brunswick Hills Racquet Club, 182 N.J. at 231.

Here, Defendants' proposed counterclaim for breach of the covenant of good faith and fair dealing alleges BFS failed to provide a "variety of franchisor support services," and engaged in alleged "bad faith actions, including but not limited to, denial of reservation services and engaging in purposeful misrepresentations to the public in acts of reprisal" against Defendants. (Counterclaim ¶¶ 28-29.) To the extent the claim is based on allegedly inadequate franchisor support services, it largely pertains to obligations expressly addressed by the Franchise Agreement. As discussed above, there is no indication, based on the alleged facts, that BFS's conduct in providing TBC training or marketing services contravened the Franchise Agreement, and Defendants cannot utilize a claim alleging breach of the covenant of good faith to alter or amplify the express terms of that contract. Wilson, 168 N.J. at 244. Likewise, to the extent the claim is based on a lack of access to the franchise reservation system, it is clear the Franchise Agreement expressly addresses suspended access due to a franchisee's failure to pay required fees. While the alleged initial delay in providing full access to the reservation system could theoretically amount to a viable claim for breach of the covenant of good faith and fair dealing, here that claim is not plausibly stated for failure to allege bad faith actions. Missing from the pleading is any concrete factual allegation demonstrating, or even giving rise to the inference, that BFS's alleged misconduct involving the reservation system—or any of their other instances of allegedly deficient performance relating to the Franchise Agreement—was done with the ill motive of frustrating Defendants' ability to receive the benefit of the Franchise Agreement.

On the facts alleged in the proposed Counterclaim, the Court concludes that Defendants'

would fail to plead a viable claim for breach of the covenant of good faith and fair dealing. As

such, leave to amend to add this claim is denied as futile.

### 3. Federal Franchise Rule

The proposed Counterclaim alleges that, prior to execution of the Franchise Agreement,

BFS did not provide TBC with certain information potential franchisees must receive pursuant to

the Federal Trade Commission's franchise disclosure rule. See 16 C.F.R. § 436. Defendants

claim they sustained damages as a result of BFS's failure to comply with its disclosure

requirements and seek recovery under the "Federal Franchise Rule." The Court cannot, however,

grant Defendants leave to file this proposed claim, even under the liberal standards of Rule

15(a)(2). While the proposed Counterclaim fails to set forth the statutory and/or regulatory

source authorizing the cause of action Defendants wish to assert, BFS points out that the federal

obligation on franchisors to make disclosures exists under 16 C.F.R. Parts 436 and 437, rules

promulgated by the Federal Trade Commission under the Federal Trade Commission Act, 15

U.S.C. § 45. BFS correctly cites Third Circuit authority observing that there is no private cause

of action under the Federal Trade Commission Act or regulations promulgated thereunder. See

Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 231 (3d Cir. 1990) (noting that

neither the FDA's nor the FTC's "constituent statutes creates [sic] an express or implied private

right of action."); see also Palermo Gelato, LLC v. Pino Gelato, Inc., No. 12-cv-931, 2013 U.S.

Dist. LEXIS 9931, 2013 WL 285547 *6 (W.D. Pa. Jan. 24, 2013) ("It is well settled that § 5 of

the FTCA (and thus Rule 436) may only be enforced by the FTC, and does not create a private

cause of action.").

Defendants do not direct the Court to any legal authority supporting the right of a private litigant to pursue redress for harm allegedly caused by violations of the federal franchise disclosure rule. Accordingly, leave to amend will be denied as futile.

4. <u>New Jersey Franchise Practices Act</u>

Defendants request leave to assert a claim under the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et seq.*, alleging BFS imposed unreasonable performance standards on the franchisee, in violation of N.J.S.A 56:10-7(e). This request must also be denied as futile. At a minimum, a franchisee must maintain a "place of business" in New Jersey to avail itself of the New Jersey Franchise Practices Act. <u>See</u> N.J.S.A. 56:10-4(a)(1) (providing that, among other limitations, the statute applies "only to a franchise . . . the performance of which contemplates or requires the franchisee to establish or maintain a place of business with the State of New Jersey…"). The statute defines "place of business" as "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's good or offers for sale and sells the franchisor's services." N.J.S.A. 56:10-3(f). TBC operated its Baymont franchise business in Rome, Georgia, as the pleadings and the Franchise Agreement make clear. Where the factual allegations of a franchisee's pleadings do not establish the statutory place-of-business requirement, the franchisee fails to state a plausible claim under the New Jersey Franchise Practices Act. <u>See</u> <u>Lawmen Supply Co. of New Jersey v. Glock, Inc.</u>, 330 F. Supp. 3d 1020, 1031-32 (D.N.J. 2018) (dismissing a franchisee's claim under the New Jersey Franchise Practices Act based on the complaint's failure to allege facts establishing its New Jersey location met the statutory definition of place of business); <u>cf.</u> <u>Red Roof Franchising, LLC v. Patel</u>, 877 F. Supp. 2d 124, 130-31 (D.N.J. 2012) (holding that, because the subject franchise was located in

New Jersey, "the NJFPA applies to claims relating to the franchise agreement notwithstanding the Texas choice of law provision.").

Accordingly, the Court concludes that Defendants' motion for leave to assert a counterclaim against BFS under the New Jersey Franchise Practices Act must be denied on grounds of futility.

      5.  New Jersey Consumer Fraud Act

Lastly, the Court addresses Defendants' request to pursue a claim under the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 *et seq.* The proposed Counterclaim alleges that by causing the franchise reservation system and third-reservation platforms, such as internet booking sites, to falsely report the TBC Baymont hotel was full and not accepting reservations, BFS engaged in an aggressive tactic to force Defendants to pay the outstanding recurring fees, amounting to an "unconscionable practice" prohibited by the CFA. These allegations do not state a claim under the CFA, which applies to fraud and any unconscionable commercial practice "in connection with the sale or advertisement of any merchandise or real estate." N.J.S.A. 56:8-2. Insofar as Defendants may be claiming that they were defrauded or misled in connection with their purchase of the franchise from BFS, the CFA does not provide redress for such alleged misconduct. "The [CFA] does not apply to the sale of a franchise." J&R Ice Cream Corp. v. Cal. Smoothie Licensing, 31 F.3d 1259, 1274 (3d Cir. 1994); see also Christy v. We The People Forms and Svc. Ctrs., USA, Inc., 213 F.R.D. 235, 240 (D.N.J. 2003) (citing J&R Ice Cream and dismissing the franchisee plaintiff's CFA claim because its franchise purchase "constitutes the purchase of a business rather than the purchase of a consumer good or service" and is therefore excluded from the protections of the Act.)

## C.      Third Party Complaint Against WHG

The proposed Third Party Complaint against WHG asserts the same five claims set forth in Defendants' proposed Counterclaim against BFS. For the reasons discussed, the claims under the Federal Franchise Rule, the New Jersey Franchise Practices Act, and the New Jersey Consumer Fraud Act are legally insufficient. As to the claims for breach of contract and breach of the covenant of good faith and fair dealing, the Third Party Complaint does not establish the existence of a valid contract between Defendants and WHG, an essential element of the claims. The third party claims would therefore not withstand a motion to dismiss.

Accordingly, leave to file the Third Party Complaint will be denied on grounds of futility.

## III.      CONCLUSION AND ORDER

For the foregoing reasons, this Court finds, in its discretion, that leave to file a further amended Answer to assert the counterclaims and third party claims reviewed in this Opinion is not warranted under Rule 15(a)(2) and the governing decisional authority. Accordingly,

**IT IS** on this on this 13th day of July 2021,

**ORDERED** that Defendants' motion for leave to file a Fifth Amended Answer, Counterclaim, and Third Party Complaint [D.E. 83] is hereby **DENIED**.

   /s/ *André M. Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge