**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BAYMONT FRANCHISE SYSTEMS, INC., | |
| Plaintiff, | |
| v. | No. 18cv620 (EP) (AME) |
| | **OPINION** |
| THE BERNSTEIN COMPANY, LLC, et al., | |
| Defendants. | |

**PADIN**, **District Judge.**[1]

Plaintiff/franchisor Baymont Franchise Systems, Inc. ("Baymont") claims that defendant/franchisee the Bernstein Company, LLC ("the LLC") breached its hotel franchise agreement (the "Agreement") and sues the LLC and its member and guarantor, defendant David B. Bernstein, for damages stemming from that breach. The LLC has defaulted.[2]

---

[1] The Court relies primarily upon the following documents in the record:
- Mallet Aff. – Affidavit of Baymont Director of Domestic Contracts Administration Kendra Mallet. D.E. 119-3.
- Couch Certif. – Certification of Baymont counsel Bryan P. Couch, Esq. D.E. 119-2.
- Bernstein Certif. – Defendant David Bernstein's Certification. D.E. 122-1.
- Bernstein Dep. – Defendant David Bernstein's Deposition. D.E. 119-2 at 24, Ex. B. to Couch Certif.
- Baymont Facts – Baymont's Statement of Undisputed Material Facts. D.E. 112-1.
- Defs. Resp. Facts – Defendants' Supplemental Responsive Statement of Material Facts. D.E. 130-1.
- Defs. Facts – Defendants' Supplemental Statement of Material Facts. D.E. 115-5.
- Mot./Reply – Baymont's summary judgment motion brief. D.E.s, 119-1, 125-26.
- Opp'n – Defendants' opposition brief. D.E. 122.

[2] Although the defaulting party does not concede conclusions of law, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir. 1990).

Baymont now moves for summary judgment against both Defendants.  The facts are straightforward: Baymont and the LLC signed the Agreement, Bernstein guaranteed to cover the LLC's obligations to Baymont if the LLC breached the Agreement, and the LLC breached by not paying fees and losing possession of the hotel.  All that remains is determining damages.  The Court will therefore **GRANT** Baymont's motion and enter judgment on those claims against Defendants, subject to a fee determination.

## I.    BACKGROUND[3]

Baymont is a guest lodging facility (hotel/motel) franchise system incorporated in Delaware with its principal place of business in Parsippany, New Jersey.  Baymont Facts ¶¶ 1, 4. Baymont does not own or operate hotels; instead, its franchise system comprises federally-

---

[3] It bears noting that Defendants' first Responsive Statement of Facts and Defendants' Facts fail to comply with Local Civil Rule 56.1(a) because most citations are not to the record, but to Bernstein's self-serving certification or inoperative pleadings.  *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.").  The only operative responsive pleading is Bernstein's initial *pro se* Answer.  D.E.s 94, 105, 111 (orders denying amendment); D.E. 28 (Answer).  This Court provided Defendants an opportunity to file another responsive statement (D.E.s 115-4, 129), but Defendants' updated response (D.E. 130-1) remains improper.

Consider one representative example: Baymont quotes the Agreement's provision requiring 1.5% monthly interest on past due amounts—a straightforward fact demanding a straightforward assessment, *i.e.,* the provision does or does not assess 1.5% interest on money owed.  Pl. Facts ¶ 18 (citing Agreement § 7.3).  Instead, Defendants argue—as far as this Court can surmise—that Baymont assessed interest in bad faith and/or with unclean hands because Defendants had not actually defaulted.  Defs. Resp. Facts ¶ 18.  This is improper argumentation which essentially seeks to litigate Defendants' defenses and purported counterclaim.  Similarly, Baymont asserts that Agreement § 3.6.4 required the LLC to send monthly revenue reports to Baymont—another straightforward fact.  But Defendants again deny it, arguing that "monthly reports were provided to BFS."  Defs. Resp. Facts ¶ 19.

These are just two of many more (and in some cases, more egregious) examples.  Although the Court has done its best to sift through Defendants' facts, the submission defeats the purpose and spirit of the rule; thus, the facts in this Opinion reflect that any fact not explicitly denied with a proper citation to the record is deemed admitted.  *See* L. Civ. R. 56.1.

registered trade names, service marks, logos and marks, and the Baymont System.  Baymont Facts (citing Mallett Aff. ¶ 5).

The LLC is a limited liability company incorporated in Louisiana with its principal place of business in Georgia.  Baymont Facts ¶ 2.  Bernstein is a member of the LLC and Louisiana resident.[4]  Baymont Facts ¶ 3.

On September 29, 2014, Baymont and the LLC entered into a franchise agreement (the "Agreement") governing the operation of a Rome, Georgia Baymont guest lodging facility designated as Site No. 49000-05529-01 and ultimately called Baymont of East Rome (the "Facility").[5]  Baymont Facts ¶ 6 (citing Mallet Aff., Ex. A).  Bernstein performed due diligence prior to executing the Agreement.  Baymont Facts ¶ 7; Bernstein Dep. 31-32.  Bernstein, an attorney on inactive status, read, reviewed, and negotiated the Agreement before signing on behalf of the LLC.  Baymont Facts ¶ 8; Bernstein Dep. 36-39 ("I felt I could handle it.").

The Agreement required the LLC to operate a Baymont facility for twenty years.  Baymont Facts ¶ 10; Agreement § 5.  The Agreement also required the LLC to pay Baymont periodically for royalties, system assessments, taxes, interest, and other fees (the "Recurring Fees").  Baymont Facts ¶ 11; Agreement §§ 7 and 18.6, Sched. C.  This amounted to a monthly royalty fee equal to "5% of the Gross Room Revenues of the Facility."  Agreement § 7.1.1.  To establish royalties, the Agreement required the LLC to prepare and submit monthly reports to Baymont disclosing, among other things, the amount of gross room revenue earned by the LLC at the Facility.  Baymont Facts ¶ 19; Agreement § 3.6.4.  The Agreement also required the LLC to pay a monthly System

---

[4] Bernstein owns 74.5%.  Non-party Steven W. Bernstein Trust owns 24.5%.
[5] The parties dispute whether the Facility had 60 (Baymont) or 64 (Bernstein) rooms, an immaterial dispute because liquidated damages are calculated as the the *lesser* of the rooms times $1,000 or the total Recurring Fees generated at the Facility during the 12 months prior to default; the latter was the lower number here.

Assessment Fee equal to 3.5% of the Facility's Gross Room Revenues.  Baymont Facts ¶ 13; Agreement § 7.1.2.

For the first three years, however, the LLC would pay a reduced, combined fee of 6% of Gross Room Revenues comprising the Royalty Fee and System Assessment Fee.  Baymont Facts ¶¶ 14-15; Agreement § 18.6.  That change would "automatically terminate without notice or opportunity to cure," if the Agreement terminated or if Baymont sent a notice of default and the LLC failed to cure.  Baymont Facts ¶¶ 16-17; Agreement § 18.6.4.  The combined fee excluded "commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge, and other similar fees and charges described on Schedule C." Agreement § 18.6.  The Agreement mandated 1.5% monthly interest on any past due amount. Baymont Facts ¶ 18; Agreement § 7.3.

The Agreement prohibited the LLC from leasing the Facility or otherwise transferring it except with Baymont's prior written consent.  Baymont Facts § 21; Agreement § 9.  Any transfer would afford Baymont the right to terminate the Agreement.  *Id.*  Baymont could also terminate the Agreement, with notice to the LLC, if the latter (1) discontinued operating the Facility as a Baymont-branded guest facility or (2) lost possession of the Facility.  Baymont Facts § 22; Agreement § 11.2.

Upon termination, the LLC would be required to pay liquidated damages, calculated as the lesser of: (1) $1,000 for each Facility guest room the LLC was authorized to operate at termination; or (2) the total amount of Recurring Fees generated at the Facility during the twelve full calendar months of operation preceding the termination month.[6]  Baymont Facts §§ 23-24; Agreement §§

---

[6] As noted above, Defendants ostensibly "dispute" these facts as they do many others.  But what they actually dispute the "applicability of liquidated damages…in the instance where [Baymont]

12.1, 18.1.  The Agreement also provided that the non-prevailing party in any dispute would pay "all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce" the Agreement.  Baymont Facts § 25; Agreement § 25.

The Agreement also contained a merger clause providing that its text was the entire agreement, superseding all previous oral and written representations, agreements, and understandings of the parties regarding the Facility and franchising.  Baymont Facts §§ 26-27; Agreement §§ 17.7.2, 17.7.3.  The Agreement likewise contained the LLC's acknowledgment that Baymont made no sales promises or projections other than those contained in the Agreement.  Baymont Facts § 28; Agreement § 17.7.4.

Finally, the Agreement prohibited Baymont from owning, operating, managing, franchising, or licensing another Baymont-branded facility within certain "Protected Territory" (a 4-mile radius).  Baymont Facts ¶¶ 30-31; Agreement § 2, App'x A (D.E. 119-3 at 44).  Baymont could, however, own, operate, lease, manage, franchise, or license other Baymont-branded facilities whose own protected territories overlapped with the LLC's.   Baymont Facts ¶ 32; Agreement § 2.

The Agreement permitted Baymont, after notice to the LLC, to suspend the Facility from Baymont's reservation system for any default or failure to pay or perform under the Agreement, including discontinuation of reservation referrals and diversion of previous reservations to other chain facilities.  Baymont Facts ¶ 34; Agreement § 11.4.

---

incorrectly billed [the LLC] and then proximately caused the" Agreement's termination.  Defs. Resp. Facts ¶¶ 23-24.  What they "dispute" is plainly not the content or import of the Agreement's liquidated damages provisions, but the question of liability: whether the LLC owes *anything* based on Baymont's alleged bad faith conduct.  Again, this is not the purpose of Rule 56.1.

Bernstein executed a guaranty of the LLC's obligations under the Agreement.  Baymont Facts ¶ 37; Mallet Aff., Ex. B (the "Guaranty").  The Guaranty required Bernstein, upon the LLC's default under the Agreement, to "immediately make each payment and perform or cause [the LLC] to perform, each unpaid or unperformed obligation of [the LLC] under the Agreement."  *Id.*; Bernstein Dep. 51-52.

## A.    Baymont terminates the Agreement

On July 5, 2017, the LLC lost possession of the Facility when it was foreclosed upon.[7] Baymont Facts ¶ 40; Bernstein Dep. 25:13-23.  By letter dated August 4, 2017, Baymont acknowledged the property's sale, informed the LLC that it considered the Agreement terminated as of the sale on July 5, and demanded $26,971.62 in liquidated damages and $53,065.89 in Recurring Fees.  Baymont Facts ¶ 41;  D.E. 119-3 at 60.

## B.    Damages sought

Since its demand, Baymont has not been paid by Defendants.  Baymont Facts ¶ 42; Bernstein Dep. 57:21-24.  According to Baymont, Defendants owe Recurring Fees of $136,767.34, inclusive of 1.5% monthly interest.  Baymont Facts ¶ 45.  Baymont also seeks $49,634.82 in liquidated damages, comprising $26,971.62 representing the total amount of Recurring Fees at the Facility during the twelve full months preceding the termination, plus $22,663.20 in total interest from August 4, 2017[8] (the termination date) through this motion's original return date.  Baymont

---

[7] Baymont asserts that this was the termination date, but that is a conclusion of law based on their interpretation of the Agreement.  Defendants dispute this without any reference to the record.  Defs. Resp. Facts ¶ 40.

[8] The interest rate is 1.5% monthly, or 18% annually.  Baymont Facts ¶¶ 50-51; Agreement §§ 12.1, 18.1.

Facts ¶¶ 50-51.[9]  Baymont also seeks $91,749.12 in attorneys' fees and $3,393.00 in costs. Baymont Facts ¶ 52.  In total, Baymont seeks $281.544.28.  Baymont Facts ¶ 53.

### C.   The Complaint

On January 16, 2018, Baymont filed its Complaint.  D.E. 1 ("Compl.").  Baymont asserted six counts: (1) Count 1 against the LLC for an accounting of all revenue derived at the Facility; (2) Count 2 against the LLC seeking liquidated damages for unilateral termination of the Agreement; (3) Count 3 against the LLC for judgment in the alternative, if liquidated damages are not awarded, for actual damages; (4) Count 4 against the LLC for Recurring Fees under the Agreement: (5) Count 5 against the LLC for unjust enrichment; and (6) Count 6 against Bernstein individually for his obligations under the Guaranty upon the LLC's default.

### D.   Procedural History

On May 15, 2018, Bernstein, an inactive lawyer licensed in Louisiana, requested permission to represent the LLC.  D.E. 12.  The Court permitted Bernstein until June 17, 2018 to retain counsel.  D.E. 14.  On June 13, 2018, Bernstein moved to dismiss for lack of proper service.  D.E. 16.  The Court denied that motion on April 1, 2019.  D.E. 25.

While that motion was pending, on July 9, 2018, the Court entered default against the LLC D.E. 18.  On October 12, 2018, Baymont moved to enter final judgment by default as to the LLC only.  D.E. 22.  On November 8, 2018, the Court denied the motion, instructing Baymont to re-file its motion for default judgment after the action against Bernstein is resolved on the merits.[10]  D.E. 23.  To date, the LLC does not appear to have ever sought to vacate the default.

---

[9] Defendants' objection here is perhaps their most egregious: an attempt to relitigate discovery and pleading issues addressed on numerous occasions by the Magistrate and District Judges previously assigned to this matter.  See, e.g., D.E. 18cv620 (denying Defendants' appeal of Magistrate Judge's decisions denying leave to file Fifth Amended Answer, Counterclaim and Third Party Complaint).
[10] Given the Court's holding here, that directive is now moot.

On April 29, 2019, after the Court denied Bernstein's motion to dismiss, Bernstein filed an Answer and asserted counterclaims against Baymont on behalf of himself and the LLC.  D.E. 28. The Court again denied Bernstein's request to represent the LLC.  D.E. 27.

Bernstein then moved to substitute himself for the LLC and filed an Amended Answer and Counterclaim.  D.Es 29, 31.  Baymont answered and opposed the motion to substitute.  D.E. 32. On July 8, 2019, Bernstein, proceeding *pro se* and purporting to represent the LLC's interest as a "substituted defendant," moved for leave to file a Second Amended Answer and Counterclaim, which asserted claims against Baymont and non-party Wyndham Hotel Group, LLC.   On December 13, 2019, the Court denied Bernstein's motions to substitute and amend.  D.E. 44.

On January 13, 2020, Bernstein moved to file a Third Amended Answer, Counterclaim, and Third-Party Complaint.  D.E. 50.  On February 7, 2020, Bernstein moved to file a Fourth Amended Answer, Counterclaim, and Third Party Complaint.  D.E. 51.  On June 17, 2020, the Court denied Bernstein's motions to reconsider and to file a Third Amended Answer, but granted Bernstein's motion for leave to file a Fourth Amened Answer, Counterclaim, and Third-Party Complaint.  D.E. 56.

On June 26, 2020, Bernstein, in his individual capacity and as Trustee of the Steven W. Bernstein Trust, filed a Fourth Amended Answer, Counterclaim against Baymont, and Third-Party Complaint against Wyndham.  D.E. 58.  Baymont and Wyndham moved to dismiss; on February 22, 2021, the Court granted their motions, striking Bernstein's Fourth Amended Answer, Counterclaim, and Third-Party Complaint without prejudice.  D.E. 81.

On March 24, 2021, Bernstein moved for leave to file a Fifth Amended Answer, Counterclaims, and a Third-Party Complaint.  D.E. 83.  On July 13, 2021, Judge Espinosa denied the motion and dismissed Defendants' Counterclaim and Third-Party Complaint.  D.E. 94.  Judge

Espinosa later denied Bernstein's motion for reconsideration.  D.E. 100.  After Bernstein appealed, Judge Vasquez affirmed Judge Espinosa's decision.  D.E. 105.

On February 16, 2022, Defendants again sought leave to amend the pleadings.  On March 3, 2022, the Court denied the request and granted Baymont's request to file this summary judgment motion.  D.E. 111.  Thus, the only operative responsive pleading remains Bernstein's initial *pro se* Answer.  D.E. 28.

### E.   This motion

Baymont now moves for summary judgment on Counts 2, 4, and 6 of the Complaint.  D.E. 119-1.  Count 2 seeks liquidated damages for the LLC's termination of the Agreement.  Count 4 seeks unpaid recurring damages against the LLC.  And Count 6 seeks both against Bernstein individually pursuant to the Guaranty.[11]

Defendants jointly (although only Bernstein has not defaulted) oppose.  D.E. 122. Baymont replied.  D.E.s 125-26.  The Court permitted Defendants to correct the defects in their Local Rule 56.1 responsive statement.  D.E. 129.  Defendants filed their updated statement.  D.E. 130.  With the Court's approval, Baymont filed a final surreply.  D.E. 133.

## II.   LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir, 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.

---

[11] Of course, awarding judgment on those claims would moot the other three: Counts 1 (accounting of revenues), 3 (actual damages if liquidated damages were not awarded), and 5 (unjust enrichment).

2d 202 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*  (citing *Anderson*, 477 U.S. at 248).  Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  Unsworn allegations in memoranda and pleadings or allegations questioning the credibility of witnesses are insufficient to defeat a properly supported summary judgment motion.  *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### III.   ANALYSIS

#### A.   The LLC breached the Agreement's unambiguous terms

Under New Jersey Law, courts may construe contracts as a matter of law when their provisions are unambiguous. *J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989); *Ram Constr. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1052 (3d Cir. 1984). Whether a contract provision or term is clear or ambiguous is a question of law and therefore suitable for a decision on a summary judgment motion. *Driscoll Const. Co., Inc. v. State, Dept. of Transportation*, 371 N.J. Super. 304, 313-14 (App. Div. 2004).

Here, there is no ambiguity, or indeed much disagreement, about the Agreement's relevant terms. The Agreement required the LLC to operate a Baymont facility for twenty years. Baymont Facts ¶ 10; Agreement § 5. During that time, the LLC was required to pay Baymont: (1) Recurring Fees; (2) a monthly royalty fee equal to "5% of the Gross Room Revenues of the Facility"; and (3) a monthly System Assessment Fee equal to 3.5% of the Facility's Gross Room Revenues. Baymont Facts ¶¶ 11, 13; Agreement §§ 7, 7.1.1, 7.1.2, and 18.6, Sched. C. As to the latter two payments, for the first three years, the LLC would pay a reduced, combined fee of 6% of Gross Room Revenues. Baymont Facts ¶¶ 14-15; Agreement § 18.6. Phrased differently, during the Agreement's first three years, the LLC had to operate a Baymont facility and pay Recurring Fees and 6% of Gross Room Revenues.

The Agreement prohibited the LLC from leasing the Facility or otherwise transferring it except with Baymont's prior written consent. Baymont Facts § 21; Agreement § 9. Any transfer would afford Baymont the right to terminate the Agreement. Agreement § 9.1 ("Your Franchise is subject to termination when the Transfer occurs."). Baymont could also terminate the

Agreement, with notice to the LLC, if the latter (1) discontinued operating the Facility as a Baymont-branded guest facility or (2) lost possession of the Facility.  Agreement § 11.2.

Defendants essentially admit to their breach.   In Bernstein's Answers to Initial Interrogatories, he answers a question about the "circumstances leading up to…the termination of the…Agreement," Bernstein explains that he was seeking financing due to low sales and struggling to make payroll.  D.E. 119-2 at 14, ¶ 16.  The "one fact on which the parties agree is that the Franchise Agreement terminated on July 5, 2017."  *Id.*  That was the day that the "hotel was essentially foreclosed upon by the bank" and the LLC "execute[d] a quit claim bill of sale." Bernstein Dep. 25:16-26:2.

At his deposition, Bernstein also admitted that the LLC was responsible for paying a reduced, 6% "combined royalty fee and marketing fee" monthly and a percentage of gross revenues, but did not pay.  Bernstein Dep. 43:3-16, 43:14-16, 57:21-24.  The LLC fell behind on its payments to Baymont "because [of] other pressing bills" like payroll, utilities, and other creditors "more threatening at the time than Baymont."  Bernstein Dep. 78:3-22.

Accordingly, Baymont has demonstrated entitlement to summary judgment on Counts 2 (liquidated damages) and 4 (Recurring Fees).

### B.     Bernstein breached the Guaranty's unambiguous terms

To obtain judgment on a personal guaranty, a plaintiff must establish six elements: (1) execution of the guaranty by the guarantor; (2) the principal obligation and terms of the guaranty; (3) the lender's reliance on the guaranty in extending monies to the borrower; (4) default by the principal obligator; (5) written demand for payment on the guaranty; and (6) failure of the guarantor to pay upon written demand.  *Ramada Worldwide, Inc. v. VMN Foothills TIC, Ltd. Liab.*

*Co.*, No. 15-cv-4078, 2017 U.S. Dist. LEXIS 164148, at *6-7 (D.N.J. Sep. 29, 2017) (citing *U.S. on Behalf of Small Business Admin. v. DelGuercio*, 818 F.Supp. 725, 727-28 (D.N.J. 1993)).

First, Bernstein admits that he signed the Guaranty.  Bernstein Dep. 51-52.

Second, the Guaranty's terms unambiguously require Bernstein to guaranty the LLC's obligations under the Agreement.  Under New Jersey law, courts may construe unambiguous guarantees as a matter of law for purposes of summary judgment.  *Nevets C.M. Inc. v. Nissho Iwai American Corp.*, 726 F. Supp. 525, 531 (D.N.J. 1989), *aff'd*, 899 F.2d 1218 (3d Cir. 1990).  Here, the Guaranty unambiguously states that upon the LLC's default, Bernstein would "immediately make each payment and perform or cause [the LLC] to perform, each unpaid or unperformed obligation of [the LLC] under the Agreement."  D.E. 119-3 at 58.

Third, by its express terms, the Guaranty's purpose was to "induce [Baymont] to sign the Agreement" with the LLC.  Fourth, as discussed above, the LLC defaulted.  Fifth, Baymont acknowledged the Agreement's termination on August 4, 2017 and advised the LLC (with Bernstein a controlling member) that it was required to pay liquidated damages and Recurring Fees.  Bernstein was therefore on notice of his obligations under the Guaranty.  And finally, Bernstein has admitted that he has not paid the Recurring Fees or liquidated damages.

Accordingly, Baymont is entitled to summary judgment on Count 6 (breach of guaranty).

## C.  Defenses

Defendants' opposition alleges substantive defenses and counterclaims clothed as "genuine issues of material fact."  Baymont raises several objections to Defendants' approach.  First, as a threshold matter, Baymont argues that the defenses and counterclaims are the defaulting LLC's, not Bernstein's, to assert.  "Generally, a guarantor, when sued by the principal's creditor pursuant to a guaranty agreement, cannot rely on an independent cause of action existing in favor of the

principal against the creditor as a defense or a counterclaim." *Continental Group, Inc. v. Justice*, 536 F. Supp. 658, 661 (D. Del. 1982) (citing *Restatement of Security* § 133 (1941)). However, an exception to the general rule exists where, as here, both the principal and guarantor are joined as defendants. *Id.* at 661. *Wingate Inns Int'l, Inc. v. Cypress Ctr. Hotels, LLC*, No. 11-6287, 2012 U.S. Dist. LEXIS 179345, at *19 (D.N.J. Dec. 19, 2012); *Travelodge Hotels, Inc. v. SD Hosp., Inc.*, No. 06-cv-1736, 2007 U.S. Dist. LEXIS 47971, at *22-23 (D. Minn. June 25, 2007). Accordingly, Bernstein may defend the LLC.

Even with standing, however, the many defenses and related counterclaims would nevertheless fail. As a threshold matter, Baymont correctly notes that if Defendants felt that Baymont had materially breached the Agreement, they had two options: stop performance and assume the contract is avoided, or continue performance and sue for damages. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992). "Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits." *Id.* (emphasis added); *Ramada Worldwide, Inc. v. Southport, Ltd. Liab. Co.*, No. 11-cv-03676, 2013 U.S. Dist. LEXIS 91719, at *15 (D.N.J. June 27, 2013) (even if defenses are valid, they do not excuse breaches of agreement); *Specialties Dev. Corp., v. C-O-Two Fire Equipment Co.*, 109 F. Supp. 732, 735 (D.N.J. 1953) (defendant's failure to terminate the contract in the face of a material breach of the license agreement may constitute a waiver of the breach and an election to continue performance thereunder).

Here, Bernstein's initial Answer alleges that he learned of the other Baymont-branded facility, the Baymont Inn & Suites of Rome, sometime in 2015. D.E. 28 ¶¶ 56-58. The Answer also alleges that issues with the reservation system as early as April 14, 2016 "caused occupancy to fall to single digits, and prevented [the LLC] from exercising its marketing plans." D.E. 28 ¶

17.   But the LLC made no attempt to terminate the Agreement, and instead elected to continue under the Agreement by operating the Facility until losing it in 2017.   Accordingly, the defenses were waived.

And finally, the individual defenses lack any support in the record.

First, Defendants argue that Baymont committed tortious interference by permitting another Baymont-branded property, the Baymont Inn of Rome, to open in the same market and refusing to allow the LLC to substitute a different midscale franchise.   However, the Agreement defines "Protected Territory" as "an area to include a four mile radius, using the hotel as the centerpoint."   Agreement App'x A.   Bernstein's own email to Baymont acknowledges that the competing hotel was 6.9 miles away—outside the Protected Territory radius.   D.E. 122-3 at 41.

Second, Defendants argue that Baymont violated the Franchise Agreement by failing to provide an operational reservation system in place for the Facility's first four to five weeks as a Baymont-branded property.   But Bernstein, in his own deposition, could not independently confirm that reservations could not be made during that time; any such allegations were based on hearsay.   Bernstein Dep. 49:6-50:4-10.   And in any event, the record contradicts that claim: an April 14, 2016 letter from Baymont provided notice that the Facility "was loaded into the BFS Central Reservations System and will be live and selling effective today."   D.E. 115-2 at 53 (noting a delay on loading onto *external* third-party travel sites of 30-90 days).

Similarly, Defendants also argue that Baymont improperly restricted the LLC from accessing the reservation system.   Baymont does not dispute that this occurred, but notes correctly that the Agreement contemplates suspension for non-payment.   Mot. 23; Agreement § 11.4.   To the extent that at least some measure of non-payment is undisputed, this does not create any genuine issue of material fact.

15

Third, Defendants allege that Baymont overbilled the LLC for a Loyalty Program Fee, a fee assessed to compensate Baymont for "qualifying stays" by guests registered with Wyndham Rewards, which resulted in the LLC paying 11% of gross room revenue instead of the Agreement's stated 6%.  As Baymont argues, however, even if the 11% total figure is correct, the Agreement explicitly excluded from the combined 6% gross revenue figure the Loyalty Program Charge.  Reply 1-2; Agreement § 18.6 ("The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement.").

And finally, Defendants argue that Baymont overbilled the LLC $250 per month by charging a retraining fee without any actual retraining.  As Baymont argues, however, Defendants do not dispute that the Agreement permitted amendment to Schedule C, which occurred on June 30, 2015 to add the $250 Loyalty Retraining Fee for "properties that do not obtain at least 10 valid enrollment stays per calendar month[.]"  D.E. 125-1 at 4; Opp'n 14; Bernstein Certif. § 5.  To the extent that Defendants argue that the retraining fee was assessed only because the LLC could not meet an "impossible" reservation quota or as an aggressive collection tactic, this argument is unsupported by facts, precedent, or any other authority.

Liability having been established, the only remaining issue is damages.

### D.      Damages

Pursuant to the Agreement, Baymont seeks a total of $281,544.28.  Mot. 13, *et seq.*  This number comprises: (1) Recurring Fees of $136,767.34 ($74,696.70 in fees, $2,340.32 in taxes, and prejudgment interest through March 8, 2022 of $59,730.32) (D.E. 119-3 at 68); (2) liquidated

damages of $49,634.82 ($26,971.62 plus $22,663.20); and (3) attorneys' fees and costs of $95,142.12 ($91,749.12 in fees and $3,393.00 in costs).

> 1.    *Baymont is awarded all Recurring Fees sought*

As discussed above, Agreement §§ 7 and 18.6 and Schedule C, and therefore the Guaranty, required Defendants to pay Recurring Fees.  Agreement § 7.3 provides that interest would accrue at the rate of 1.5% per month on all past due payments; *see also Mid-Jersey Bank v. Fidelity-Mortgage Investors*, 518 F.2d 640, 645 (3d Cir. 1975) (holding that New Jersey law permits pre-judgment interest agreed to by the contracting parties), *superseded on other grounds by statute as discussed in Langlais v. Pennmont Benefit Servs.*, No. 11-5275, 2014 U.S. Dist. LEXIS 45945, at *25 (E.D. Pa. Apr. 3, 2014).

Baymont details the Recurring fees in a ledger attached to Mallet's affidavit.  D.E. 119-3 at 63, *et seq.*  Defendants do not challenge most of Baymont's accounting, but even the challenges are speculative and unsupported.  For example, Defendants challenge a monthly charge of $565 for ""5335A-SYNXIX-PM-SAAS" because they are unable to explain that fee.  Opp'n 26.  Similarly, Defendants express concern that several payments were not credited.  *Id.*

However, as Baymont notes in reply, Baymont has submitted an authenticated business record.  *Celotex*, 477 U.S. at 324 (a party need not produce evidence in a form that would be admissible at trial at the summary judgment stage).  Defendants had the opportunity to depose Baymont's witness Robert Spence, who was designated to address the calculation of Recurring Fees, but did not ask about the line items challenged here.  Nor have Defendants submitted proof of any supposed credits that are not already reflected in the ledger.  Accordingly, Baymont is entitled to damages on its Recurring Fees claim for $136,767.34.

2.      *Baymont is awarded all liquidated damages sought*

The Agreement's §§ 12.1 and 18.1 provide for liquidated damages, calculated as the lesser of: (1) $1,000 for each Facility guest room the LLC was authorized to operate at termination; or (2) the total amount of Recurring Fees generated at the Facility during the twelve full calendar months of operation preceding the termination month.  Baymont pursues the latter.

New Jersey courts approve of liquidated damages provisions which are "a reasonable forecast of just compensation for the harm that is caused by the breach" and where harm "is incapable or very difficult of accurate estimate."  *Wasserman's v. Twp. of Middletown*, 137 N.J. 238, 250 (1994); *D. H. M. Indus., Inc. v. Cent. Port Warehouses, Inc.*, 127 N.J. Super. 499, 503 (App. Div. 1973).  Baymont notes correctly that liquidated damages clauses like the one here have been regularly enforced by this Court.  Mot. 15 (collecting cases); *see, e.g. Knights Franchise Sys. v. P.C.P.S. Corp.,* No. 06-5243, 2009 U.S. Dist. LEXIS 98405, at *11 (D.N.J. Oct. 21, 2009) ("liquidated damages provisions should be deemed presumptively reasonable and the party challenging such a clause should bear the burden of proving its unreasonableness").

Accordingly, the Court finds the liquidated damages provision reasonable, and agrees with Baymont's calculation of $26,971.62, which represents the Recurring Fees generated at the Facility during the 12 full calendar months preceding the Agreement's termination.  The Court likewise agrees with the interest calculation of $22,663.20, resulting in a total liquidated damages award of $49,634.82.

3.      *Baymont is entitled to attorneys' fees and costs*

New Jersey law permits recovery of attorneys' fees and costs pursuant to a voluntary agreement.  *Cohen v. Fair Lawn Dairies, Inc.*, 86 N.J. Super. 206, 212 (App. Div), *aff'd*, 44 N.J. 450 (1965).  Here, the Agreement's § 17.4 unambiguously provides that any non-prevailing party

would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce [the] Agreement or collect amounts owed under" it.  For the reasons above, Defendants have not prevailed.  Baymont has demonstrated, and Defendants have not objected, that costs total $2,993.00.[12]  D.E. 119-2 at 282.

As to fees, Baymont alleges that it has incurred $91,749.12 for various stages of litigation.  However, Baymont has failed to attach any billing records, citing to "attorney-client privilege" concerns and offering to submit the record for *in camera* review.  Some fees are appropriate in this instance, but without the record, the Court is unable to determine the amount of fees owed.  However, the Court will not permit *in camera* review; instead, Plaintiff must submit its application in the normal course, pursuant to Local Civil Rule 54.2.

## IV.    CONCLUSION

For the reasons above, Baymont's motion for summary judgment (D.E. 119) is **GRANTED** and Baymont shall be entitled to judgment against Defendants, jointly and severally, in the amount of $189,395.16, plus attorneys' fees in an amount to be determined.  An appropriate order accompanies this Opinion.

Dated: March 9, 2023

Evelyn Padin, U.S.D.J.

---

[12] Baymont seeks $3,393.00, but the records do not justify that amount.